IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**THOMAS KIMMONS and**                                                                            **PLAINTIFFS**
**GICELIA SWOPES**

**v.**                                             **Case No. 4:19-cv-00876-LPR**

**AUTOZONE, INC., et al.**                                                                     **DEFENDANTS**

## **ORDER**

Before the Court is Defendant Cyprus Mines' Motion to Dismiss for Lack of Personal Jurisdiction.[1] For the reasons discussed below, the Motion to Dismiss is well-taken and will be GRANTED. However, the Court wishes to emphasize two preliminary points. First, Plaintiffs' case still proceeds. This case has been brought against eleven defendants. The instant ruling applies only to Cyprus Mines. Second, nothing in this Order suggests that Cyprus Mines cannot or should not be sued in connection with the issues in this case. Cyprus Mines is incorporated in Delaware and has its principal place of business in Arizona. Courts in those locations would be able to constitutionally assert jurisdiction over Cyprus Mines.

## **Background and Findings of Fact**

Can this Court constitutionally assert jurisdiction over Cyprus Mines because it (or its subsidiaries) provided talc to Johnson & Johnson, which incorporated the talc into consumer products and then sold those consumer products in Arkansas? Cyprus Mines says no, arguing that it "undertook no suit-related activities in or directed toward Arkansas, and there is therefore no basis for specific jurisdiction over it."[2] Plaintiffs say yes, arguing that "[s]pecific jurisdiction is

---

[1] Def. Cyprus Mines' Mot. to Dismiss (Doc. 63).

[2] Def. Cyprus Mines' Br. in Supp. of Mot. to Dismiss (Doc. 64) at 1.

appropriate as Cyprus [Mines] purposefully directed actions at Arkansas"[3] because "Cyprus [Mines] knew that Johnson's Baby Powder and Shower-to-Shower, containing its talc, was being marketed and sold across the country, including in Arkansas."[4]  Plaintiffs emphasize that Cyprus Mines intentionally became the exclusive supplier of talc to Johnson & Johnson.[5]

The resolution of this Motion is not entirely dictated by precedent.  The U.S. Supreme Court and the Courts of Appeals have been wrestling with similar questions since the Supreme Court issued a splintered opinion in *Asahi Metal Industry Co. v. Superior Court, Solano Cty*.[6]  And while the Supreme Court and the Eighth Circuit have established some general guideposts that lend a hand in resolving this Motion, there is not yet a hard and fast rule that governs the question presented here.  Indeed, the relevant Supreme Court cases suggest an ongoing exploration of whether there *should* be any hard and fast rule that governs the question presented here.[7]  My role

---

[3] Pls.' Resp. to Cyprus Mines' Mot. to Dismiss (Doc. 81) at 1.

[4] *Id.* at 6.

[5] *Id.* at 5-6.

[6] 480 U.S. 102 (1987).  The plurality opinion in *J. McIntyre Machinery Ltd. v. Nicastro*, 564 U.S. 873 (2011), while not the controlling opinion in that case, still provides a fairly good summary of the confusion that arose post-*Asahi* from placing too much emphasis or focus on the stream-of-commerce:

> The imprecision arising from *Asahi*, for the most part, results from its statement of the relation between jurisdiction and the stream of commerce.  The stream of commerce, like other metaphors, has its deficiencies as well as its utility. It refers to the movement of goods from manufacturers through distributors to consumers, yet beyond that descriptive purpose its meaning is far from exact. This Court has stated that a defendant's placing goods into the stream of commerce with the expectation that they will be purchased by consumers in the forum State may indicate purposeful availment.  But that statement does not amend the general rule of personal jurisdiction.  It merely observes that a defendant may in an appropriate case be subject to jurisdiction without entering the forum—itself an unexceptional proposition—as where manufacturers or distributors seek to serve a given State's market.  The principal inquiry in cases of this sort is whether the defendant's activities manifest an intention to submit to the power of a sovereign.  In other words, the defendant must purposefully avail itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. Sometimes a defendant does so by sending its goods rather than its agents. The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State.

*Id.* at 881-82 (plurality opinion) (quotations and citations omitted).

[7] *See, e.g., id.* at 873 (4-2-3 split primarily over the propriety of adopting a bright-line rule in stream-of-commerce cases); *id.* at 890 (Breyer, J., joined by Alito, J., concurring in the judgment) ("But though I do not agree with the plurality's seemingly strict no-jurisdiction rule, I am not persuaded by the absolute approach adopted by the New

2

as a district judge is not to resolve that debate, but rather to as faithfully as possible apply the general guideposts created by the Supreme Court and the Eighth Circuit.

To survive a motion to dismiss for lack of personal jurisdiction, the nonmoving party must make a *prima facie* showing that personal jurisdiction exists, "which is accomplished by pleading sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state."[8]  If a defendant makes a Rule 12(b)(2) motion, the path for resolution of that motion depends in part on whether a court chooses to hold a hearing or "instead relies on pleadings and affidavits."[9]  If a court chooses the latter approach, it "must look at the facts in the light most favorable to the nonmoving party and resolve all factual conflicts in favor of that party."[10]  Because this Court has not held a hearing on this matter, the following factual findings are based on the pleadings and record evidence, resolving all factual disputes in favor of Plaintiffs and also taking all reasonable inferences in favor of Plaintiffs.  These factual findings are not valid for any purpose other than the resolution of the instant Motion.

---

Jersey Supreme Court and urged by respondent and his *amici*."); *id.* at 887 (Breyer, J., joined by Alito, J., concurring in the judgment) ("I think it unwise to announce a rule of broad applicability without full consideration of the modern-day consequences.").

[8] *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591-92 (8th Cir. 2011) (internal quotations omitted).

[9] *Johnson v. Arden*, 614 F.3d 785, 793 (8th Cir. 2010) (quoting *Epps v. Stewart Info. Serv. Corp.*, 327 F.3d 642, 646-47 (8th Cir. 2003)).  The Court may rely on allegations in the pleadings unless they are controverted by factual evidence from the defendants.  The Eighth Circuit has held that "[w]hen a defendant raises through affidavits, documents or testimony a meritorious challenge to personal jurisdiction, the burden shifts to the plaintiff to prove jurisdiction by affidavits, testimony or documents." *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1073 (8th Cir. 2004) (quoting *Jet Charter Serv., Inc. v. W. Koeck*, 907 F.2d 1110, 1112 (11th Cir. 1990)).

[10] *Johnson*, 614 F.3d at 793-94 (quoting *Epps*, 327 F.3d at 646-47).  Of course, even in this scenario, a plaintiff seeking to establish that a court has personal jurisdiction over a specific defendant still "carries the burden of proof and that burden does not shift to the party challenging jurisdiction." *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (quoting *Epps*, 327 F.3d at 647)).  And to resolve the dispute the Court will consider the pleadings as well as the affidavits and exhibits submitted to support or oppose the Motion.  *See K-V Pharm. Co.*, 648 F.3d at 591-92.  However, it bears emphasizing that "jurisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing." *Epps*, 327 F.3d at 647.

The Court's factual findings are as follows:

1. Mr. Kimmons was exposed to asbestos in Arkansas and developed mesothelioma as a result of years of using Johnson & Johnson's talcum powder products: Johnson's Baby Powder and Shower-to-Shower. Mr. Kimmons or his family purchased the relevant products in Arkansas. Mr. Kimmons' exposure period was from 1968 to 1970 and from 1981 to the late 2000s.[11]

2. During the latter exposure period, Johnson & Johnson used talc supplied by Cyprus Mines for the relevant products.[12] During some of the latter exposure period, Cyprus Mines was one of several talc suppliers to Johnson & Johnson. During some of the latter exposure period, Cyprus Mines was Johnson & Johnson's exclusive talc supplier.[13] At the time it began a supplier relationship with Johnson & Johnson (back in 1979) and throughout the period it was supplying Johnson & Johnson with talc, Cyprus Mines knew that Johnson & Johnson sold talc-containing products across the United States, including in Arkansas.[14]

3. In 1979, Johnson & Johnson was purchasing Italian talc from Charles Mathieu, Inc. and its subsidiary, Metropolitan Talc. That year, Cyprus Mines acquired those companies. Cyprus Mines continued the operations of Charles Mathieu and its subsidiary and supplied talc to Johnson & Johnson.[15] The Court does not know how much talc Cyprus Mines supplied to Johnson & Johnson through this arrangement.

---

[11] Pls.' Compl. (Doc. 1) at 7.

[12] Attach. (Resps. to Interrogs.) to Pls.' Resp. to Cyprus Mines' Mot. to Dismiss (Doc. 81-2) at 5-6. The Court is attributing the actions of Cyprus Mines' subsidiaries to Cyprus Mines. Because the Court ultimately concludes it cannot constitutionally assert jurisdiction over Cyprus Mines, there is no need to analyze whether such attribution is appropriate.

[13] Attach. (Talc Supply Agreement) to Pls.' Resp. to Cyprus Mines' Mot. to Dismiss (Doc. 81-6) at 9.

[14] *See id.* (stating that Cyprus Mines' subsidiary would be Johnson & Johnson's exclusive supplier of talc "in the United States").

[15] Attach. (Resps. to Interrogs.) to Pls.' Resp. to Cyprus Mines' Mot. to Dismiss (Doc. 81-2) at 5.

4.      In 1989, Cyprus Mines purchased Windsor Minerals from Johnson & Johnson. The sale was predicated upon a concurrent agreement between Cyprus Mines and Johnson & Johnson that Cyprus Mines would be the exclusive supplier of talc to Johnson & Johnson.[16] The agreement ensured that Cyprus Mines would be Johnson & Johnson's exclusive talc supplier for five years (for products manufactured in the United States).  The agreement also ensured that, after this initial period of exclusivity, Johnson & Johnson would purchase at least 98 percent of the talc it needed from Cyprus Mines for the following five years (for products manufactured in the United States).[17] Cyprus Mines was the exclusive talc supplier to Johnson & Johnson (for products manufactured in the United States) until 1992, when Cyprus Mines sold off its talc business.[18]  That was three years after the exclusive agreement began.

5.      The agreement required Johnson & Johnson to purchase a minimum of 50,000 tons of talc from Cyprus Mines in the first five-year period.[19]  Because Cyprus Mines sold off its talc business three years into the agreement, the Court does not know how much talc Johnson & Johnson actually purchased from Cyprus Mines pursuant to the agreement.  In theory, it could be zero tons; it could be something between zero and 50,000 tons; it could be 50,000 tons, or it could be more.

6.      In the letter of intent that foreshadowed the agreement, Cyprus Mines and Johnson & Johnson "agreed to certain concepts regarding [Johnson & Johnson's] right to participate in the development and marketing of new talc products developed by Cyprus."[20] For example, in a

---

[16] Attach. (Stock Sale Agreement) to Def. Cyprus Mines' Mot. to Dismiss (Doc. 63-1) at 65.

[17] Attach. (Talc Supply Agreement) to Pls.' Resp. to Cyprus Mines' Mot. to Dismiss (Doc. 81-6) at 9.

[18] Attach. (Aff. of John Fenn) to Def. Cyprus Mines' Mot. to Dismiss (Doc. 63-1) at 4.

[19] Attach. (Talc Supply Agreement) to Def. Cyprus Mines' Mot. to Dismiss (Doc. 63-1) at 243.

[20] Attach. (Letter re: Acquisition of Windsor Minerals, Inc.) to Def. Cyprus Mines' Mot. to Dismiss (Doc. 63-1) at 207.

section entitled "J & J/Cyprus Product Development," an attachment to the letter explains that "Cyprus' knowledge of talc and J&J's marketing knowledge could be used to the benefit of both parties."[21]  The document goes on to say:

> Joint Development
> Both parties may agree to participate in the joint development of new body powder and toiletries.  In these cases, J&J would be the sole marketer and Cyprus the sole product supplier.  Other specific terms and conditions would be subject to agreement on a case-by-case basis.
>
> Development by Cyprus
> Cyprus' lab and cosmetics marketing/sales group have developed and continue to work toward proprietary higher value-added talc applications in body powders and toiletries. Cyprus agrees to provide J&J with a "first-review" of the new product(s) toward the goal of negotiating a mutually acceptable marketing arrangement. This "first-review" period shall not exceed ninety days unless mutually extended by the parties.[22]

7.  The agreement itself noted that both parties "acknowledge that" Johnson & Johnson's "talc marketing expertise" and Cyprus Mines' "technical expertise may be used to the mutual benefit of the parties."[23]  The agreement provided that both parties "may agree to collaborate in the development of new body powders, toiletries or other talc-containing consumer products."[24]  And "[i]n the event that" Cyprus Mines "shall develop a new, proprietary, talc-containing body powder or toiletry," Cyprus Mines "shall provide to" Johnson & Johnson "sufficient information concerning such application to permit" Johnson & Johnson "to determine" Johnson & Johnson's "interest in further collaboration therein."[25]  The agreement provided that "[i]n the event" the two parties "collaborate in the development of a new application," Johnson &

---

[21] *Id.* at 223.

[22] *Id.*

[23] Attach. (Talc Supply Agreement) to Def. Cyprus Mines' Mot. to Dismiss (Doc. 63-2) at 32.

[24] *Id.* at 33.

[25] *Id.*

6

Johnson "shall have the exclusive right to market the same," and Cyprus Mines "shall be the exclusive supplier of talc therefore pursuant to the terms and conditions set forth herein."[26]

  8.  This is all the Court has been told about Cyprus Mines' supposed contacts with the State of Arkansas.  There is nothing to suggest that Cyprus Mines mined or processed talc in Arkansas.  There is nothing to suggest that Cyprus Mines sold talc in or into Arkansas.  There is nothing to suggest that Cyprus Mines had any ability to control or influence what Johnson & Johnson did with the talc it purchased from Cyprus Mines.  There is nothing to suggest that Cyprus Mines had any ability to control or influence where Johnson & Johnson sold its consumer products.  There is nothing to suggest that Cyprus Mines advertised (on its own behalf or on behalf of Johnson & Johnson) in Arkansas.  There is nothing to suggest that Cyprus Mines was part of any marketing effort for Johnson & Johnson products in or directed towards Arkansas.  And there is nothing to suggest that the contractual potential for collaboration between Johnson & Johnson and Cyprus Mines described in paragraphs 6 and 7 above actually occurred.

  9.  There is more potentially relevant information that the Court does not know.  The Court has not seen any facts regarding the specific mix of ingredients in Johnson & Johnson's products.  The Court has not been told in what form Johnson & Johnson gets the talc and what Johnson & Johnson has to do to transform the talc into Johnson & Johnson's final commercial products.  The Court has not been told how many Johnson & Johnson products containing talc were sold in Arkansas each year between 1979 and 1992—either as an absolute number or as a percentage of nationwide or worldwide sales of the same product.  The Court has not been told how much money Cyprus Mines made from the relationship, nor how much of that money was in

---

[26] *Id.*

any way linked to Johnson & Johnson's sales in Arkansas. The Court is not going to engage in speculation as to any of this.[27]

## Conclusions of Law

In a diversity case, a federal district court can assert personal jurisdiction over a defendant to the extent allowed by the long-arm statute of the forum state and the Due Process Clause.[28] The Arkansas long-arm statute authorizes personal jurisdiction to the fullest extent possible consistent with the Due Process Clause.[29] Accordingly, the question here is whether an assertion of personal jurisdiction over Cyprus Mines would violate the Due Process Clause. "Due process requires 'minimum contacts' between [a] non-resident defendant and the forum state such that 'maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"[30] Specifically, there must exist "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."[31] "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts . . . ."[32]

While it is true that the "interests of the forum State and of the plaintiff in proceeding with the cause in the plaintiff's forum of choice" are among the "variety of interests" that "a court must consider," the Supreme Court has recently reaffirmed (in an 8-1 opinion) that "the 'primary

---

[27] In its Response brief, Plaintiffs call Johnson & Johnson's products "ubiquitous" and explain that talc is one of two ingredients (the other being fragrance) in Johnson & Johnson's baby powder. Pls.' Resp. to Cyprus Mines' Mot. to Dismiss (Doc. 81) at 5-6. Arguments of counsel in briefs are not facts. Nor are they allegations in a complaint. And the Court has not been asked to take judicial notice of any facts.

[28] *K-V Pharm. Co.*, 648 F.3d at 592.

[29] ARK. CODE ANN. § 16-4-101. *See Davis v. St. John's Health Sys., Inc.*, 348 Ark. 17, 22-23, 71 S.W.3d 55, 58 (2002); *Dever*, 380 F.3d at 1073.

[30] *Dever*, 380 F.3d at 1073 (referencing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-92 (1980)).

[31] *Romak USA, Inc. v. Rich*, 384 F.3d 979, 984 (8th Cir. 2004) (internal quotation omitted).

[32] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation omitted).

concern' is 'the burden on the defendant.'"[33] And in that opinion the Court made clear that assessing the burden on the defendant is more than just a ho-hum question about the practical difficulties a defendant might face in litigation away from home:

> Assessing this burden obviously requires a court to consider the practical problems resulting from litigating in the forum, but it also encompasses the more abstract matter of submitting to the coercive power of a State that may have little legitimate interest in the claims in question. As we have put it, restrictions on personal jurisdiction "are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States." "[T]he States retain many essential attributes of sovereignty, including, in particular, the sovereign power to try causes in their courts. The sovereignty of each State . . . implie[s] a limitation on the sovereignty of all its sister States." And at times, this federalism interest may be decisive. As we explained in *World-Wide Volkswagen*, "[e]ven if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment."[34]

The Eighth Circuit has a five-part test for measuring minimum contacts: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties."[35] Consistent with the Supreme Court's just-discussed exposition of the law, the Eighth Circuit has instructed that "[t]he first three factors are the most important."[36]

The amount of minimum contacts necessary to satisfy due process is different for general jurisdiction and specific jurisdiction. General jurisdiction is the power to adjudicate *any* claim

---

[33] *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017) (quoting *World–Wide Volkswagen*, 444 U.S. at 292).

[34] *Id.* at 1780-81 (citations omitted).

[35] *Miller v. Nippon Carbon Co.*, 528 F.3d 1087, 1091 (8th Cir. 2008) (quoting *Bell Paper Box, Inc. v. U.S. Kids, Inc.*, 22 F.3d 816, 819 (8th Cir. 1994)).

[36] *Federated Mut. Ins. Co. v. FedNat Holding Co.*, 928 F.3d 718, 720 (8th Cir. 2019).

9

involving a particular defendant.[37]  A court has general jurisdiction over a defendant who has "continuous and systematic" contacts with the forum state.[38]  Plaintiffs do not argue that this Court has general jurisdiction over Cyprus Mines.  Even where general jurisdiction is lacking, a court can have specific jurisdiction over a defendant.  Plaintiffs argue that the Court has specific jurisdiction over Cyprus Mines in this case.[39]

The Supreme Court has repeatedly emphasized that "[s]pecific jurisdiction is very different"[40] from general jurisdiction:

> In order for a state court to exercise specific jurisdiction, the suit must arise out of or relate to the defendant's contacts with the forum.  In other words, there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.  For this reason, specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.[41]

"Specific jurisdiction over a defendant is exercised when a state asserts personal jurisdiction over a nonresident defendant that 'has purposefully directed [its] activities at [the forum state's] residents' in a suit that 'arises out of' or 'relates to' these activities."[42]  "Specific jurisdiction is proper 'only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state, meaning that the defendant purposely directed its activities at the forum state and the claim arose out of or relates to those activities.'"[43]

---

[37] *Miller*, 528 F.3d at 1091.

[38] *Johnson*, 614 F.3d at 794.

[39] Pls.' Resp. to Cyprus Mines' Mot. to Dismiss (Doc. 81) at 1 (arguing that "[s]pecific jurisdiction is appropriate").

[40] *Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780.

[41] *Id.* at 1780-81 (cleaned up) (internal quotations and citations omitted).

[42] *Johnson*, 614 F.3d at 794 (quoting *Lakin v. Prudential Sec., Inc.*, 348 F.3d 704, 707 (8th Cir. 2003)).

[43] *Id.* at 795 (quoting *Steinbuch v. Cutler*, 518 F.3d 580, 586 (8th Cir. 2008)).

Cyprus Mines argues that the pleadings and record facts are insufficient to support an assertion of specific jurisdiction over it.[44]  Cyprus Mines argues that "the unilateral act of a third party to bring products that may contain Cyprus Mines' talc into the state of Arkansas cannot be a basis for personal jurisdiction over Cyprus Mines, and Cyprus Mines did not target Arkansas in any way."[45]  The Court agrees.  That Cyprus Mines supplied Johnson & Johnson with talc knowing that Johnson & Johnson used the talc in products it sold all over the United States (and in Arkansas specifically) is not enough.  Under Supreme Court and Eighth Circuit precedent, more is necessary to show purposeful availment or purposeful direction.  Given the facts in the record of this case, the only potential "more" is the fact that Cyprus Mines intentionally and contractually became the exclusive supplier of talc to Johnson & Johnson.  No case from the Supreme Court or the Eighth Circuit holds that such facts alone would change the personal jurisdiction calculus.  To the contrary, the general guideposts provided by precedent from these courts at least imply that such additional facts on their own remain insufficient to justify an assertion of specific jurisdiction.

*J. McIntyre Machinery, Ltd. v. Nicastro* is the Supreme Court's most recent case that directly and substantively addresses the stream-of-commerce theory in personal jurisdiction doctrine.[46]  In that case, the defendant was "a British firm that manufactures scrap-metal machines in Great Britain and sells them through an independent distributor in the United States."[47]  The controlling opinion—a concurrence in judgment by Justices Breyer and Alito—concluded that

---

[44] Def. Cyprus Mines' Br. in Supp. of Mot. to Dismiss (Doc. 64) at 4.

[45] *Id.* at 15.

[46] 564 U.S. 873.  One could argue that *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773 (2017), tangentially relates to the stream-of-commerce theory.  But that case's unique facts called for a limited holding that did not really address stream-of-commerce issues.

[47] 564 U.S. at 887-888 (Breyer, J., joined by Alito, J., concurring in the judgment).

11

New Jersey could not constitutionally assert jurisdiction over the British firm.[48] This was because "the relevant facts found by the New Jersey Supreme Court show no 'regular . . . flow' or 'regular course' of sales in New Jersey; and there is no 'something more,' such as special state-related design, advertising, advice, marketing, or anything else."[49] Justices Breyer and Alito acknowledged that "[t]here may well have been . . . facts that [the plaintiff] could have demonstrated in support of jurisdiction," but emphasized that "the plaintiff bears the burden of establishing jurisdiction."[50] In accordance with *J. McIntyre*, this Court will "take the facts precisely" as provided.[51]

Plaintiffs have not provided facts to support a reasonable inference that—during the exposure period—there was a "'regular . . . flow' or 'regular course' of sales in" Arkansas of the relevant Johnson & Johnson products. Plaintiffs have not even alleged it in their Complaint. This alone is fatal to their argument. But even if Plaintiffs had provided such facts, that would not be enough. In *J. McIntyre*, the Court was addressing a manufacturer-distributor relationship. Moreover, in that case there were indications that the British manufacturer at least partially directed and guided the advertising and sales efforts of its American distributor.[52] The instant case is different. We are not dealing with a manufacturer-distributor relationship. Cyprus Mines is the supplier and Johnson & Johnson is the manufacturer. And the record facts do not reveal that Cyprus Mines can or has in any way directed or even participated in the marketing or sales of

---

[48] *Id.* The opinion by Justices Breyer and Alito is the controlling opinion under *Marks v. United States*, which held that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. 188, 193, (1977) (quotation omitted).

[49] *J. McIntyre*, 564 U.S. at 889 (Breyer, J., joined by Alito, J., concurring in the judgment).

[50] *Id.* at 889-90.

[51] *Id.* at 890.

[52] *Id.* at 879 (plurality opinion).

Johnson & Johnson products. If the Breyer and Alito opinion concurring in judgment stands for any black and white rule, the rule would be that context matters in personal jurisdiction cases, and that the activity that suffices to assert personal jurisdiction in one type of case (for example, a manufacturer-distributor case where the manufacturer gives some direction as to sales and marketing) does not necessarily suffice in another type of case (for example, a supplier-manufacturer case where the supplier gives no such direction).[53]

Eighth Circuit precedent highlights the important of context.[54] In *Clune v. Alimak AB*, the Eighth Circuit held that a "manufacturer that successfully employs one or two distributors to cover the United States intends to reap the benefit of sales in every state where those distributors market."[55] But in *Clune* it was the manufacturer that "created the distribution system that brought" the offending product into the forum state by using a subsidiary as its exclusive distributer.[56] And members of the manufacturer's board of directors also served as directors of the distributer subsidiary.[57]

---

[53] *Id.* at 890-91 (Breyer, J., joined by Alito, J., concurring in the judgment). This controlling opinion disagreed with the "absolute approach" that "a producer is subject to jurisdiction for a products-liability action so long as it 'knows or reasonably should know that its products are distributed through a nationwide distribution system that *might* lead to those products being sold in any of the fifty states.'" *Id.* (quoting *Nicastro v. McIntyre Mach. Am., Ltd.*, 201 N.J. 48, 76-77, 987 A.2d 575, 592 (2010)). Justices Breyer and Alito could not "reconcile so automatic a rule with the constitutional demand for 'minimum contacts' and 'purposefu[l] avail[ment],' each of which rest upon a particular notion of defendant-focused fairness." *Id.* at 891 (quoting *World-Wide Volkswagen*, 444 U.S. at 291, 297). Instead, their opinion harkens back to Justice Steven's partial concurrence in judgment in *Asahi*. 480 U.S. at 121 (Stevens, J., joined by White, J. and Blackmun, J., concurring in the judgment).

[54] Most of the Eighth Circuit's on-point precedents predate *J. McIntyre*. However, since the controlling opinion in *J. McIntyre* concluded that "resolving this case requires no more than adhering to our precedents," that case should not have rendered the Eighth Circuit cases obsolete. *J. McIntyre*, 564 U.S. at 890 (Breyer, J., joined by Alito, J., concurring in the judgment).

[55] 233 F.3d 538, 544 (8th Cir. 2000).

[56] *Id.* at 541-44.

[57] *Id.* at 544. A concurring judge placed special emphasis on the subsidiary's relationship with the manufacturer, stating that "[t]his connection between the foreign manufacturer and the resident subsidiary represents more than simply placing a product into the stream of commerce." *Id.* at 547 (Bright, J., concurring).

On that same side of the line is *Anderson v. Dassault Aviation*, where the Eighth Circuit allowed an exercise of personal jurisdiction over a French airplane manufacturer (Dassault Aviation) that sold airplanes to its American subsidiary (Dassault Falcon Jet Corporation), who then resold those airplanes to customers. The Eighth Circuit explained that "Dassault Aviation bought what is now Dassault Falcon Jet in 1994, and since then has consistently acted to consolidate the image and operations of the two companies."[58] The Eighth Circuit emphasized that "the directors of the two companies overlap: both the CEO and the President of Dassault Falcon Jet are also officers and directors of Dassault Aviation,"[59] and that "the CEO of Dassault Falcon Jet receives all his compensation from Dassault Aviation."[60] Moreover, the Court explained that "[i]t is readily apparent from the jointly produced website and publications, and the similarities in names and logos, that the two companies utilize a unified marketing strategy."[61]

On the other hand, in *Guinness Imp. Co. v. Mark VII Distributors, Inc.*, the Eighth Circuit rejected the argument that a Jamaican brewing company was subject to a Minnesota court's jurisdiction because when it "sold its beer for distribution in America, it must have known and intended that the beer would find its way to Minnesota."[62] The Court held that the brewer was not subject to jurisdiction in a Minnesota court because its beer was "distributed in Minnesota and elsewhere through distributors chosen by the importer," and the brewer "exercised no control over the beer, the importer, or the distributor once the beer left" its possession in Jamaica.[63]

---

[58] *Anderson v. Dassault Aviation*, 361 F.3d 449, 454 (8th Cir. 2004).

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] 153 F.3d 607, 615 (8th Cir. 1998).

[63] *Id.*

The facts relevant to the instant Motion are even further from *Clune* and *Dassault* than the facts of *Guinness*. Our Defendant is a supplier, not a manufacturer. In *Stanton v. St. Jude Med., Inc.,* which involved a lawsuit over a "component part to a product[,]" the Eighth Circuit rejected the argument that a part supplier "should reasonably anticipate being haled into court anywhere in the United States because" it knew that a manufacturer was placing a finished product "which included [the] component part . . . into the national stream of commerce."[64] The Eighth Circuit held that the part supplier was not subject to personal jurisdiction in Nebraska, where an injury occurred, because "[w]hatever contacts the [part] may have had with Nebraska were the result of the actions of" the finished product's manufacturer and not the part supplier.[65] In my view, the status and activities of Cyprus Mines places it somewhere between the Jamaican Brewing Company in *Guinness* and the parts supplier in *Stanton*. That strongly suggests it would be unconstitutional to assert jurisdiction over Cyprus Mines simply because Cyprus Mines supplied talc to a company it knew (and hoped) would sell talc-containing products to every state in the United States (including Arkansas). The bottom line is that Cyprus Mines has not directed and is not responsible for whatever flow of goods Plaintiffs might have (but have not) shown.

The controlling opinion in *J. McIntyre* is a little unclear as to whether a plaintiff needs to show (1) *both* a regular flow (or course) of sales into the forum state *and* "something more," or (2) *either* a regular flow (or course) of sales into the forum state *or* "something more."[66] Even assuming the latter suffices, Plaintiffs have failed to show "something more" on this record. In their briefing, the only "something more" asserted is Cyprus Mines' successful efforts to become the exclusive talc supplier for Johnson & Johnson. Plaintiffs argue:

---

[64] *Stanton v. St. Jude Med., Inc.*, 340 F.3d 690, 694 (8th Cir. 2003).

[65] *Id.*

[66] *J. McIntyre*, 564 U.S. at 889 (Breyer, J., joined by Alito, J., concurring in the judgment).

15

> Cyprus attempts to paint itself as a passive bystander, failing to acknowledge its contractual role as the exclusive supplier of all talc to Johnson's Baby Powder, the eponym of talcum powder sold to masses of consumers. . . .
>
> Cyprus will have the Court believe that "[i]f any purportedly asbestos-containing talc mined or sold by Cyprus Mines eventually appeared in Arkansas, such occurrence was merely 'random [or] fortuitous.'" But Cyprus was at relevant times the ***exclusive*** talc supplier for Johnson & Johnson, manufacturer of the ubiquitous Johnson's Baby Powder. Johnson's Baby Powder contains two ingredients – talc and fragrance. Cyprus knew that Johnson's Baby Powder and Shower-to-Shower, containing its talc, was being marketed and sold across the country, including in Arkansas. For a period of time, every single container of Baby Powder and Shower-to-Shower sold . . . contained Cyprus's talc. Cyprus did not merely supply some talc to Johnson and Johnson that "may have ultimately ended up in a finished product that made its way to [Arkansas]." Rather, it contracted to be the exclusive supplier to Johnson & Johnson for all talc, including the primary ingredients in its omnipresent Baby Powder and its Shower-to-Shower products. Cyprus knowingly supplied Johnson & Johnson with talc sold and used in Arkansas.[67]

Plaintiffs have not cited a single case that shows an exclusive supplier relationship adds the "something more" that is necessary for a constitutional assertion of personal jurisdiction over a supplier like Cyprus Mines. Nor have they cited a single case that suggests a supplier's business strategy efforts to serve the needs of a particular manufacturer (even on an exclusive basis) count as the requisite "something more."

The failure to find such cases makes perfect sense to me. Whether a supplier is supplying 50% or 100% of a necessary component doesn't significantly change where its components are ending up, how its components are getting there, or the general desire a supplier would have for the manufacturer to increase sales. Exclusivity simply increases the degree of knowledge a supplier has that its component parts are reaching everywhere the manufacturer's product is sold. But mere knowledge is not enough to justify an assertion of jurisdiction. Nor is a desire for a manufacturer to increase sales. And why should it matter whether a supplier like Cyprus Mines was contacted by a manufacturer like Johnson & Johnson to begin (or increase) a relationship, or

---

[67] Pls.' Resp. to Cyprus Mines' Mot. to Dismiss (Doc. 81) at 6 (emphasis in original) (internal citations omitted).

16

if a supplier like Cyprus Mines actively solicited a manufacturer like Johnson & Johnson for business? That has nothing to do with the State of Arkansas.

These facts are pretty far afield from the "something more" factors discussed in *J. McIntyre* or the Eighth Circuit precedent identified above. It may well be that the factors identified by Plaintiffs in our case, when combined with additional factors not present in our case, might push some other hypothetical case across the line. But, in the context of the case at bar and standing completely on their own, they just don't get Plaintiffs over the hump. Here again, there may be additional facts Plaintiffs could have alleged or presented that would meet the "something more" standard. But they did not do so, and the Court will "take the facts precisely" as provided.[68]

Based on the foregoing, the first three factors of the relevant five-factor test suggest that it would be unconstitutional to assert personal jurisdiction over Cyprus Mines in the circumstances of this case. For the purposes of this Motion, I will assume that factor four—the interest of the forum state in providing a forum for its residents—weighs in favor of asserting personal jurisdiction. I will also assume that factor five—the convenience of the parties—weighs in favor of asserting jurisdiction (for at least some of the reasons discussed in Plaintiffs' Brief). The Eighth Circuit has made clear that the first three factors are more important than the final two.[69]

---

[68] *J. McIntyre*, 564 U.S. at 889 (Breyer, J., joined by Alito, J., concurring in the judgment).

[69] *Federated Mut. Ins. Co.*, 928 F.3d at 720 ("The first three factors are the most important."). Plaintiffs do not argue that the *Calder* effects test should apply here, even though one or two counts in the Complaint are arguably intentional torts. I am not sure *Calder* was meant to apply in a case like this. Even it did, it would not change my ultimate decision. The Eighth Circuit has expressly "construe[d] the *Calder* effects test narrowly . . . ." *Johnson*, 614 F.3d at 797. The Eighth Circuit treats "the *Calder* test merely as an additional factor to consider when evaluating a defendant's relevant contacts with the forum state." *Id.* at 796-97. Our case presents, at most, a pale reflection of the nature and type of effects *Calder* addressed. As the Eighth Circuit explained in *Dakota Industries v. Dakota Sportswear*, the *Calder* decision "approved an 'effects' test that allows the assertion of personal jurisdiction over non-resident defendants whose acts 'are performed for the very purpose of having their consequences felt in the forum state.'" 946 F.2d 1384, 1390-91 (8th Cir. 1991). In *Calder*, the whole point of the allegedly libelous news article in the National Enquirer was to create a negative effect in California on a California resident. And the National Enquirer had a huge circulation in California, magnifying the effects. Our case is different. The alleged intentional torts in our case were not performed for the very purpose of having their consequences felt in Arkansas; certainly not in the way *Calder* meant this phrase. If *Calder* has any weight in this analysis, it is very light.

Accordingly, it would violate the Due Process Clause to assert personal jurisdiction over Cyprus Mines in this action.

## Conclusion

For the foregoing reasons, Cyprus Mines' Motion to Dismiss is GRANTED. No party has asked me to consider a transfer of the claims against Cyprus Mines to another federal district court. And no party suggests that the statute of limitations has run between the filing of the instant case and the date of this Order. I believe that, in these circumstances, dismissal makes more sense than transfer. The interests of justice are better served by dismissal.

IT IS SO ORDERED this 11th day of September 2020.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE